UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| H.M. & I.B., | ) |
| Plaintiffs, | ) |
| | ) CIVIL ACTION FILE |
| v. | ) |
| | ) NO. _____ |
| RADHESHVAR, LLC, d/b/a | ) |
| MOTEL 6, | ) |
| Defendant. | ) JURY TRIAL DEMANDED |

## COMPLAINT



---

[1] Plaintiffs have concurrently filed a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include Plaintiffs' sex trafficking. Plaintiffs' anonymity will provide for their own personal safety and will protect Plaintiffs from the public disclosure of details that are intimate and personal in nature.

### III. Defendant's knowledge of sex trafficking generally.

17.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Victims Protection Act in 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

18.

Defendant knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the Motel 6. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000.[2] Over the last two decades, sex trafficking has generated billions of dollars

---

[2] See Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM (last visited Sept. 9, 2024); *see also* Meredith Dank et al., *Estimating the Size and Structure of the*

-7-

in illicit profits in metro Atlanta alone. Defendant has received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Plaintiffs.

19.

Defendant knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[3] and as "the number one city for child sex trafficking."[4]

20.

Defendant knew or should have known that hotels and motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J. and Thomas, J.).

---

*Underground Commercial Sex Economy in Eight Major US Cities* 30–32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Sept. 9, 2024).

[3] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month (Jan. 29, 2015), https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Sept. 9, 2024).

[4] *Id.*

21.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received involving hotels and motels reported sex trafficking, and another 2.6 percent reported a combination of sex and labor trafficking.[5] A 2012 study found that 63 percent of trafficking incidents occurred in hotels.[6] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with hotels at some point" during their exploitation.[7] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from hotel staff."[8]

---

[5] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://humantraffickinghotline.org/sites/default/files/Hotel%20and%20Motel%20Topical.pdf (last visited Sept. 9, 2021).

[6] Jon Conte et al., *Businesses Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), [https://web.archive.org/web/20210511135432/https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf].

[7] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited Sept. 9, 2024).

[8] *Id.* at 23.

22.

Defendant knew or should have known that attorneys for the hotel industry estimated and reported to hotel industry representatives that eight out of ten human trafficking arrests occur in or around hotels,[9] and that the industry had been warned, among other things, to "Make sure hotel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[10]

23.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[11]

24.

Defendant knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

---

[9] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), [https://web.archive.org/web/20191030203754/http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983].

[10] *Id.* at 19.

[11] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Sept. 9, 2024).

(a) establish corporate policy and procedures against sexual exploitation of children;

(b) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

(c) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(d) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f) report annually on the company's implementation of Code-related activities.

25.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels.

26.

Defendant knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct

housekeeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

(a) persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b) persons who lack freedom of movement or are constantly monitored;

(c) persons who have no control over or possession of money or ID;

(d) persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e) requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

(f) the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g) extended stay with few or no personal possessions in the room;

(h) excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(i) the same person reserves multiple rooms;

(1) a room is rented hourly, less than a day, or for an atypical extended stay;

(2) attempts to sell items to or beg from patrons or staff;

-13-

(3) cars in the parking lot regularly parked backward, so the license plates are not visible;

(4) loitering and solicitation of male patrons;

(5) waiting at a table or bar and picked up by a male (trafficker or customer);

(6) persons asking staff or patrons for food or money; and

(7) persons taking cash or receipts left on tables.



Case 1:24-cv-04039-TWT Document 7-1 Filed 09/09/24 Page 13 of 24